UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12680 |
| | ) | |
| JEFFREY S. BILFIELD and | ) | Chapter 7 |
| JANET M. BILFIELD, | ) | |
| | ) | |
| Debtors. | ) | Chief Judge Pat E. Morgenstern-Clarren |
| _____ | ) | |
| | ) | |
| BANKERS HEALTHCARE GROUP, INC., | ) | Adversary Proceeding No. 12-1208 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| JEFFREY S. BILFIELD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The plaintiff Bankers Healthcare Group, Inc. filed this adversary proceeding against the

debtors Dr. Jeffrey and Janet Bilfield seeking to deny them a discharge and to have a debt

allegedly owed to it declared nondischargeable. The debtors counterclaimed, alleging that

Bankers Healthcare willfully violated the automatic stay provisions of Bankruptcy Code § 362(a)

when, after the debtors filed their chapter 7 case, Bankers Healthcare attempted to collect the

debt at issue. Bankers Healthcare admits that it violated the automatic stay, but claims that the

violation was inadvertent and that the debtors overreach in their damage claim.

Earlier, the court entered summary judgment against Bankers Healthcare dismissing the

complaint and also denied its motion to reconsider.[1] The case went to trial on the debtors'

---

[1] Docket 39, 40, 55. The court held, in essence, that Bankers Healthcare lacked standing
when it filed this adversary proceeding.

counterclaim, only, as well as on the debtors' motion for an order to show cause why Bankers

Healthcare should not be held in contempt for violating the automatic stay.[2]  For the reasons

stated below, the court will enter judgment in favor of the debtors on their counterclaim,

awarding some, but not all, of the damages.[3]

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334 and General Order No. 2012-7 entered

by the United States District Court for the Northern District of Ohio on April 4, 2012.  This is a

core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), and it is within the court's

constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*,

131 S.Ct. 2594 (2011).

## THE EVIDENTIARY HEARING

The court held an evidentiary hearing on May 28, 2013.  The debtors presented their case

through their own testimony, as well as cross-examination, and exhibits.  Bankers Healthcare

presented its case through the testimony of Kristian Vartabedian (collection manager for Bankers

Healthcare) and Christopher Cali (in-house general counsel for Bankers Healthcare), together

with cross-examination, and exhibits.

The findings of fact set forth below are based on that evidence and reflect the court's

weighing of the evidence presented, including determining the credibility of the witnesses.  "In

doing so, the Court considered the witness's demeanor, the substance of the testimony, and the

---

[2]  Case No. 12-12680, Docket 30, 44, 48.  Although the motion also sought relief against
Christopher Cali, the debtors dropped that demand at trial.

[3]  This makes the contempt motion moot.

context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language or nuance of expression." *In re The V Companies*, 274 B.R. 721, 726 (Bankr. N.D. Ohio 2002). *See* FED. R. BANKR. P. 7052 (incorporating FED. R. CIV. P. 52). When the court finds that a witness's explanation was satisfactory or unsatisfactory, it is using this definition:

> The word satisfactory 'may mean reasonable, or it may mean that the Court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation–he believes what the [witness] says with reference to the [issue at hand]. He is satisfied. He no longer wonders. He is contented.'

*United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 659 (Bankr. N.D. Ohio 1990) (discussing the issue in context of bankruptcy code § 727) (quoting *First Texas Savings Assoc., Inc. v. Reed*, 700 F.2d 986, 993 (5th Cir. 1983)).

## FACTS

A.      **The Debtors File for Bankruptcy and Notify Bankers Healthcare**

Bankers Healthcare originates about 1,500 loans a year to physicians, dentists, and veterinarians. When the debtors Jeffrey and Janet Bilfield[4] filed their bankruptcy case on April 11, 2012, they scheduled Bankers Healthcare as a creditor because Jeffrey–a dentist–had borrowed money from it in 2009.

Bankers Healthcare received actual notice of the filing in two ways. First, through a phone call from Janet on April 11. She had called Bankers Healthcare a few weeks earlier to report trouble making the loan payments and that they would be filing a bankruptcy case, adding

_____

[4] Because the debtors have the same last name, the court will use their first names for clarity.

3

that she would let Bankers Healthcare know when the filing took place.  When they did file,

Janet immediately called and spoke to "Chris", who thanked her for calling.  Bankers Healthcare

argued that their records do not show the second phone call.  The court credits and is satisfied

with Janet's account of these phone calls because she understood that the filing created an

automatic stay and that it was in her family's best interest to make sure that Bankers Healthcare

had the filing information promptly.

Second, Bankers Healthcare received the filing notice sent directly from the court by

regular U.S. mail, postage prepaid to 4875 Volunteer Road, Suite 100, Southwest Ranches,

Florida.[5]  Bankers Healthcare argued that its Florida office then had to mail the notice to its New

York office, which delayed its receipt.  While this may be true, Bankers Healthcare

acknowledged that the Florida address could be used for service; whatever delay occurred after

that was because of Bankers Healthcare's internal procedures.  In any event, there was no

testimony as to when the Florida office forwarded the notice or when the New York office

received it.  Further, there was no testimony that linked whatever this delay was to Bankers

Healthcare's actions and failures to act, as described further below.  And also, Bankers

Healthcare already had actual notice of the filing from Janet and could have verified the filing

through its access to computerized court records available to the public (PACER).[6]

**B.      Bankers Healthcare Files a State Court Lawsuit After the
         Debtors file for Bankruptcy**

On April 17, 2012–six days after the debtors filed their bankruptcy case– Bankers

---

[5] Answer to Counterclaim at ¶ 10; Exhibit EE, Response to Request for Admission No.
6.

[6] Exhibit EE, Response to Request for Admission No. 27.

Healthcare filed suit against Jeffrey Bilfield dba Jeffrey S. Bilfield, D.D.S. and Jeffrey individually in the Supreme Court of New York, Onondaga County. The complaint listed Christopher J. Cali, 325 James Street, Syracuse, New York as counsel for the plaintiff (the State Court Lawsuit). Bankers Healthcare, though its general counsel Cali, served the summons and complaint on both defendants that same day by certified mail, return receipt requested. The filing of the State Court Lawsuit and service of the summons and complaint came after Bankers Healthcare had actual knowledge of the bankruptcy filing.

C.     **The Debtors' Counsel Advises Attorney Cali Again of the Bankruptcy Filing**

When Janet received the State Court Lawsuit documents, she immediately took them to their bankruptcy counsel, asking angrily why Bankers Healthcare was allowed to do this after the bankruptcy filing. On April 20, 2012, the debtors' attorney sent a letter to Cali giving him the bankruptcy case number and the filing date, and asking that the State Court Lawsuit be dismissed immediately. Bankers Healthcare did not respond to the letter, at any time.

D.     **Bankers Healthcare Serves Jeffrey for a Second Time, This Time Personally at his Home**

Bankers Healthcare hired Guaranteed Subpoena Service, Inc. to serve the State Court Lawsuit documents by personal service. Bankers Healthcare routinely communicates with Guaranteed Subpoena by email and by accessing its account on the Guaranteed Subpoena web site. Bankers Healthcare did not tell the process server that Jeffrey had filed a bankruptcy case.

Late on the night of May 1, 2012, a man from Guaranteed Subpoena came to the debtors' home and rang the bell. When Janet spoke to him through the door, he demanded that she sign a receipt to acknowledge service of the State Court Lawsuit summons and complaint. To avoid

5

having her children hear this commotion, Janet opened the door, signed the papers, and called her attorney, again upset and again asking why Bankers Healthcare was permitted to do this.

### E. Bankers Healthcare Serves Jeffrey for a Third Time, This Time Personally at his Dental Office

On May 29, 2012, the same man came to Jeffrey's dental office, where Janet has worked as the office manager for about 17 years. Two long-time patients and their child were in the waiting room and office area. Janet was finishing up the morning's paperwork. When the process server saw her, he said: "Oh, it's you. You have to sign this." Janet refused and the process server became quite loud and started yelling at her. Janet stood up from her desk, at which time the process server threw the papers at her. She blocked the papers from hitting her face by putting her arms up. At that point, the process server ran out of the office.

Janet attempted to make a joke to the patients to cover the situation, saying "I wouldn't buy whatever he's selling." Although the patients booked their next appointments before they left, they did not keep them and have not returned to the practice. Until then, they had come regularly for checkups at six month intervals, each of which visits generated a fee of $154.00 per person. They were also supposed to have three filings done at $178.00 each.

At some point, Jeffrey–who had been a few feet away–ran over to Janet to find out what was happening. Shaking, Janet locked the door behind the patients and put her desk back in order. She immediately called her attorney, again asking why Bankers Healthcare was permitted to do this and repeating that she had been told that the court protects debtors from this kind of action and that they did not feel protected at all.

6

**F.    The Debtors Take Action to Try to Prevent Other Patients from Witnessing Any Further Actions by Bankers Healthcare**

The debtors were upset that patients had witnessed the exchange with the process server. Janet immediately rearranged Jeffrey's schedule so that there would be a time gap between patients, reasoning that this would reduce the chance that anyone would be in the waiting room to see any further actions by Bankers Healthcare.  To this day, she still schedules a reduced patient load for Jeffrey, saying that it is for patient safety.  They also started to refer out the patients who needed time consuming work, such as extractions, root canals, complicated implants, and scaling and root planing because those require someone to accompany the patient for transportation. Some of the referred patients have returned to the practice for other dental care, some have not.

**G.    Jeffrey's Health Condition, Both Before and After May 1, 2013**

Jeffrey was diagnosed with multiple sclerosis in September 2001.  He did well for more than 10 years on prescribed medications and was able to continue with all aspects of his dental practice.  He also was quite active in his personal life, including running, cycling, painting, and coaching Little League.  Things changed in the months after the process server came to the office, with Jeffrey having to use a cane and being unable to exercise or do household chores as he had before.  His relationship with Janet has also taken a turn for the worse.

He testified that he does fewer dental procedures because he has changed physically and mentally.  He attributes this decline to seeing his wife assaulted in their office, and Janet agrees. At this point, he does not feel physically able to do the more complicated procedures.

**H.    Bankers Healthcare's Internal Procedures Upon Notice of a Bankruptcy Filing (Before the Incidents at Issue Here)**

Kristian Vartabedian is the collections manager for Bankers Healthcare, a position he also

7

held at the time of these incidents. He started with Bankers Healthcare in 2007 when he graduated from college and was promoted to manager five years ago. When he started, the then-manager "Nadine" and general counsel Cali trained him to follow these procedures when a borrower files for protection under the bankruptcy laws: Vartabedian confirms the filing on PACER and files a proof of claim. Phone calls and letters have to stop, and lawsuits cannot go forward. The borrower's file is to be moved on an Excel spreadsheet from an active queue to a legal queue, and the paper file is to be moved from one filing cabinet to another.

Bankers Healthcare did not have a procedure under which Vartabedian's department would notify anyone else. No one told Guaranteed Subpoena not to serve the State Court Lawsuit documents because that was not Bankers Healthcare's practice.

Bankers Healthcare had a training manual at the time; however, Vartabedian –Bankers Healthcare's designated deposition representative– chose not to turn it over in this case because he did not review it to see if it had anything relevant in it. He does not know why Bankers Healthcare served Jeffrey three times, but ventured that it was "just to be sure."

Christopher Cali testified that he has been Bankers Healthcare's general counsel and senior vice president since 2007. The company has had a few hundred accounts file for bankruptcy. Cali received the April 20, 2012 letter from the debtors' attorney advising of the bankruptcy filing, but did not respond to it. He did not know before this case that Bankers Healthcare had a duty to stop serving a debtor with a summons and complaint. He admits that Bankers Healthcare should have had a procedure in place to prevent violations of the automatic stay. Eventually, after the debtors filed their motion for sanctions for violation of the automatic stay against both Cali and Bankers Healthcare, he instructed a collections representative to tell

8

Guaranteed Subpoena to stop service. The representative sent an email to Guaranteed Subpoena to that effect on June 15, 2012. Cali then instructed outside counsel to try to settle the matter.

### I. Bankers Healthcare's Internal Procedures Upon Notice of a Bankruptcy Filing (After the Incidents at Issue Here)

Cali testified that he now has a procedure in place to prevent these kinds of stay violations. He did not describe the procedure in any detail and did not offer a copy of the new procedure into evidence.

### J. The Debtors' Claimed Damages for Violations of the Automatic Stay

The debtors presented evidence to support their claim that Banker Healthcare's stay violations had injured them. That evidence is discussed below.

## THE POSITIONS OF THE PARTIES

The debtors argue that Bankers Healthcare willfully violated the automatic stay three times: by filing the State Court Lawsuit and failing to tell Guaranteed Subpoena not to serve the papers, thus leading to the May 1 and May 29 visits by the process server to the debtors' home and dental practice. They contend that Bankers Healthcare's actions caused damage to the dental practice and to Jeffrey's health, as well as emotional distress to both debtors. Additionally, they incurred attorney fees to address the repeated violations. They ask for these damages: $12,000 to $15,000 in lost income, three times that for emotional distress damages, and four times that for punitive damages. They also ask for their attorney fees, in an amount to be determined at a later hearing.

Bankers Healthcare admitted that the process server visits violated the stay, although it denied that the violation was willful. It contends that filing the State Court Lawsuit was only a

9

technical violation of the stay because it did not have actual knowledge of the bankruptcy filing until Cali received the April 20 letter from the debtors' counsel.  Finally, it denies any responsibility for Jeffrey's health change, attributes any business fall off to Jeffrey's condition rather than to anything Bankers Healthcare did, and argues that this is not an appropriate case for punitive damages because it has changed its practices.

Bankers Healthcare raised numerous affirmative defenses in its answer, including that the debtors lacked standing to raise the claim, they failed to mitigate their damages, the doctrines of unclean hands, in pari delicto, unjust enrichment, contributory negligence, and the like.  Of these defenses, the only ones that Bankers Healthcare pursued at trial are that the applicable law bars the debtors from recovering damages for emotional distress and that Janet cannot recover damages for emotional harm in any event because Bankers Healthcare violated the stay trying to collect a debt that was owed by Jeffrey, not Janet.

## DISCUSSION

When an individual files a bankruptcy case, the Bankruptcy Code automatically protects the debtor from any act by any entity to recover a prepetition debt.  11 U.S.C. § 362(a)(6).  The stay specifically bars any effort to commence or continue any judicial action against the debtor that could have been commenced before the bankruptcy was filed, including issuing service of process.  11 U.S.C. § 362(a)(1).  "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors.  It stops all collection efforts, all harassment, and all foreclosure actions."  H.R. Rep. 95-595, at 340 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6296; *see also Smith v. First Am. Bank, N.A. (In re Smith)*, 876 F.2d 524, 527 (6th Cir. 1989) (noting the automatic stay's

10

"fundamental role" in the Bankruptcy Code's debtor protection scheme). An individual injured by a willful violation of this automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).

A violation of the automatic stay is willful "if the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case." *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001) (internal quotation marks and citation omitted). The test for a willful violation of the automatic stay can be summarized in this way:

> A specific intent to violate the stay is not required, or even an awareness by the creditor that [its] conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional. Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages.

*In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997) (internal quotation marks and citation omitted); *see also In re Webb*, 472 B.R. 665 at *15 (B.A.P. 6th Cir. 2012) (unpublished opinion). A willful violation can be found based on an act of omission. *In re Banks*, 253 B.R. 25, 31 (Bankr. E.D. Mich. 2000). "Courts find a violation of the stay based on an act of omission when a creditor fails to cure a previous violation of the stay or otherwise restore the status quo." *Id.* "Under 'general principles of agency law . . . a creditor-principal is liable under § 362(k) for the acts of an agent . . . who willfully violates the automatic stay taken when those acts are within the scope of their principal-agent relationship.'" *In re Webb*, 472 B.R. 665 at n. 4 (quoting *Theokary v. Abbatiello (In re Theokary)*, 444 B.R. 306, 323–24 (Bankr. E.D.Pa. 2011)).

11

### A.    Did Bankers Healthcare Willfully Violate the Stay?

As found above, Bankers Healthcare had actual knowledge that the debtors filed for protection under the bankruptcy law on April 11, 2012 when Janet called. Every act taken after that phone call was a stay violation: the filing of the State Court Lawsuit and its service by certified mail, the process server's visit to the debtors' home on May 1, and the process server's visit to the dental practice on May 29. Given Bankers Healthcare's actual knowledge of the bankruptcy filing, each one of the violations, including those by its agent Guaranteed Subpoena, was willful.

### B.    Are the Debtors Entitled to An Award of Actual Damages?

Section 362(k) calls for an award of actual damages, including costs and attorney fees, when there has been a willful stay violation. Damages must be proven with reasonable certainty and must not be speculative or based on conjecture. *Archer v. Macomb Cnty. Bank*, 853 F.2d 497, 499-500 (6th Cir. 1988). Any damages must have been reasonably incurred as a proximate result of the stay violation and must have a sufficient factual foundation. *In re Baer*, No. 11-8062, 2012 WL 2368698 at *10 (B.A.P. 6th Cir. June 22, 2012) (unpublished opinion); *Grine v. Chambers (In re Grine)*, 439 B.R. 461, 468-69 (Bankr. N.D. Ohio 2010). The debtors must prove their damages by a preponderance of the evidence. *In re Baer*, 2012 WL 2368698 at *10.

There is a split in the case authority regarding whether a debtor can recover damages for emotional distress caused by a stay violation. *Compare Dawson v. Washington Mut. Bank (In re Dawson)*, 390 F.3d 1139, 1148 (9th Cir. 2004) (determining that actual damages for a willful violation of the automatic stay may include damages for emotional distress); and *Fleet Mortgage Grp., Inc. v. Kaneb*, 196 F. 3d 265, 269 (1st Cir. 1999) (suggesting that damages for emotional

12

distress qualify as actual damages under §362(k)), with *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001) (noting that "actual damages" contemplates financial loss rather than compensation for emotional distress); and *United States v. Harchar*, 331 B.R. 720, 728 (N.D. Ohio 2005) (concluding that emotional damages are not compensable). The Sixth Circuit has not taken a position on this issue.

**Economic Damages:** The debtors claim that they suffered these economic damages: reduced income from the dental practice when they had to limit the number of patients and kinds of procedures to keep people out of the waiting room after the May 29 incident; the loss of the two patients who were in the waiting room when the process server arrived; out of pocket expenses for parking, trips to their counsel's office, and photocopying documents to respond to discovery requests; and attorney fees.

The major economic damage the debtors seek is for a decline in their business revenues. Janet testified that she immediately changed the way she scheduled patients so that no one would ever be in the waiting room to witness any other entry by the process server. She did this in two ways: by scheduling the patients farther apart and by declining to do the more complicated procedures that require someone to wait to take the patient home after the procedure. They referred patients who needed the latter procedures to other providers; as a result, they lost the income from those procedures as well as the return patient visits from some of the referred individuals.

The court believes that Janet made these changes and that she did so at least initially to prevent any other patient from witnessing a return visit by the process server. At that point, Bankers Healthcare had violated the stay three times, had ignored the letter from debtors'

13

counsel, and had made unauthorized visits to the debtors both at home and at the office. Janet's decision to keep people out of the waiting room was a reasonable one to try to avoid more damage. The amount of time that she has maintained that reduced schedule, however,–from May 30, 2012 to the trial one year later– cannot fairly be attributed to Bankers Healthcare's acts.

The court finds that it was reasonable for a one month period to reduce the schedule to see if Bankers Healthcare would violate the stay yet again. The court selects one month because this is about the amount of time that elapsed between the May 1 violation and the May 29 violation, making it reasonable for the debtors to think that another service attempt might be made during the following month. The debtors presented some general evidence about lost income, but it was not presented in sufficient detail to allow the court to determine exactly how much income the debtors lost during that month. As a result, damages cannot be awarded on this claim.

The second economic loss is the debtors' claim that they lost the business of the two patients who were in the waiting room when the process server confronted Janet. The evidence showed that these were long time patients who came every six months for dental checkups, at a fee of $154.00 per person. And that although these patients had scheduled their next appointments in accordance with their long-standing practice, they did not in fact appear and have never come back. The court finds that it is more likely than not that these patients decided not to return to the practice because of the scene they witnessed in the waiting room with their child and that in so doing the debtors lost at least one visit per patient in the next six months, as well as the lost income from the scheduled fillings. This totals $842.00 in damages ($308.00 in lost revenue for the next cleaning appointment plus $534.00 for the three fillings).

14

The third economic loss is out of pocket expenses incurred in prosecuting the motion and the counterclaim in the adversary proceeding. The debtors presented undisputed testimony that they incurred parking charges to attend hearings ($13.00 per hearing times three hearings=$39.00) and copy costs totaling $570.00, both of which are compensable as actual damages for a total of $609.00. They did not, however, provide sufficient evidence to support their claim for mileage costs incurred in traveling from their office to meet with their attorney because they did not identify the exact number of trips or the mileage reimbursement amount that they thought should be used as a multiplier.

The fourth economic loss is that the debtors incurred attorney fees. Those are compensable, and will be resolved on the briefing schedule set out below.

**Emotional Distress Damages:** The debtors seek compensation for their emotional distress, pointing to their dismay over the continuing contacts by Bankers Healthcare and the temporal decline in health suffered by Jeffrey. This court agrees with the courts that hold that emotional distress damages are actual damages that can be recovered for a stay violation, especially when the debtor proves economic damage. The court does not, however, need to decide that issue definitively here because, even if those damages are theoretically recoverable, the evidence did not support such an award. While the standard for determining whether emotional damages are justified is not clearly defined, at a minimum the evidence must show a close causal connection between the stay violation and the emotional harm suffered. *See In re Dawson*, 390 F.3d at 1149 (stating that an individual must "demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)"); *In re Baer*, 2012 WL

15

2368698 at *10 (stating that an individual seeking damages under §362(k) must prove that the stay violation proximately caused the damages); *McCool v. Beneficial (In re McCool)*, 446 B.R. 819, 824 (Bankr. N.D. Ohio 2010) (same). Additionally, there must be corroborative evidence of such damages, which is usually offered in the form of medical evidence. *In re McCool,* 446 B.R. at 824; *In re Pawlowicz*, 337 B.R. 640, 647-48 (Bankr. N.D. Ohio 2005).

While the debtors believe that Bankers Healthcare's actions caused Jeffrey to go into a physical decline, thus causing emotional distress, there was no medical evidence to support that theory. The court takes judicial notice that, generally speaking, multiple sclerosis is a complicated disease that can be exacerbated by stress. That does not, however, establish anything about Jeffrey's particular condition. The fact that Jeffrey's physical decline followed the stay violations could mean that the violations caused the decline or it could mean something else; a physician would be the only one who could determine that. No health care provider testified to support this claim and so the court may not award any damages.

As to Janet's distress, Bankers Healthcare questions whether she has standing to assert a claim for emotional damages because, although she is a joint debtor in the chapter 7 case, she did not owe the debt at issue and the stay was not violated as to her. The constitutional limits on standing are met here because Janet is asserting an injury in fact, that is traceable to Bankers Healthcare's actions, and that is likely to be redressed by the remedy requested. *LPP Mortg. Ltd. v. Brinely*, 547 F.3d 643, 647-48 (6th Cir. 2008). Bankers Healthcare's argument challenges prudential standing and whether Janet's claim falls within the zone of interests protected by § 362(k). The court need not decide that issue, however, as the evidence was insufficient to show that Janet experienced anything beyond the stress that normally attaches to someone whose

16

family business is failing and who decides to file for bankruptcy. While the court does not minimize that stress, it cannot support a separate damage award under these facts.

**C.    Are the Debtors Entitled to An Award of Punitive Damages?**

A party injured by a willful violation of the stay may also recover punitive damages in appropriate circumstances. To obtain punitive damages, the party must show that the "creditor's conduct was 'egregious, vindictive, or intentionally malicious.'" *In re Baer*, 2012 WL 2368698 at 10 (quoting *In re Bivens*, 324 B.R. 39, 42 (Bankr. N.D. Ohio 2004)). While proof of an overt wrongful intent is not required, it must be shown that the creditor acted in bad faith or otherwise undertook its actions in reckless disregard of the law. *Id.*

The evidence showed that Bankers Healthcare is in the business of originating loans to health care providers. As with any lending business, some of those loans are bound to fail and some of the borrowers are bound to file for protection under the bankruptcy laws. In fact, that is exactly what happened with a few hundred Bankers Healthcare borrowers. And yet, despite having access to both general counsel and outside counsel, Bankers Healthcare did not have any effective bankruptcy procedure in place to stop the filing of lawsuits and to instruct its process server to immediately cease efforts to serve any such lawsuit that had been filed. Collections manager Vartabedian and general counsel Cali testified to Bankers Healthcare's policy on learning of a bankruptcy filing: they moved the debtor's name from one computer file to another and re-located the paper file in the filing cabinets. This is woefully inadequate to insure that Bankers Healthcare ceased all efforts to collect a debt, as seen by what happened in this case. Bankers Healthcare easily could have, and should have, put a policy in place to protect the rights of those borrowers.

17

That general counsel for Bankers Healthcare did not understand the ramifications of a bankruptcy filing is certainly no excuse; in fact, it makes matters worse. Moreover, when debtors' counsel wrote to general counsel Cali, he did not take any action to investigate and stop the process server, thus allowing the May 1 and May 29 violations to occur. Not until June 15, 2012–almost two months after Bankers Healthcare knew about the bankruptcy filing and two weeks after the debtors filed their motion for sanctions–did Bankers Healthcare instruct the process server to stop.

These events, viewed in the aggregate, show a reckless disregard for the debtors' rights under the Bankruptcy Code. And that reckless disregard establishes that an award of punitive damages is appropriate.

In defense, Bankers Healthcare argued that it did not really do anything *affirmatively* to violate the stay; it simply did not tell the process server to stop, thus suggesting a kind of innocence. This is a distinction without a difference: after Bankers Healthcare set Guaranteed Subpoena in motion, it had an affirmative obligation to call it off. Bankers Healthcare also hinted that it was the process server that violated the stay, not Bankers Healthcare. Again, this misses the point. Bankers Healthcare hired the process server and the process server was the agent of Bankers Healthcare; as such, Bankers Healthcare is responsible for the acts of its agent. All of Bankers Healthcare's actions and failures to act, taken together, show that Bankers Healthcare acted with reckless disregard of the law.

Bankers Healthcare also contends that punitive damages should not be awarded because Bankers Healthcare has fixed the problem by adopting a new policy. While such a policy may exist, it was not introduced into evidence either in writing or in detailed testimony. Without that

18

factual support, this argument is insufficient to ward off punitive damages or to be a factor in deciding the amount of the award.

Given all of the above and, in particular the three separate willful violations of the automatic stay, the amount of time it took for Bankers Healthcare to issue instructions to the process server to stand down, and how simple it would have been to issue those instructions weeks earlier, the court awards these punitive damages:

For the first violation committed on April 17, 2012 when Bankers Healthcare filed the State Court Lawsuit and served the summons and complaint by certified mail–$1,500.00;

For the second violation committed on May 1, 2012 when the process server came to the debtors' home, the amount assessed for the first violation will be doubled to $3,000; and

For the third violation committed on May 29, 2012 when the process server came to the dental practice, the amount assessed for the second violation will be doubled to $6,000.00.

This results in a total punitive damage award of $10,500.00 ($1,500.00+ $3,000.00 + $6,000.00).

The remaining issue, as noted above, is an award of attorney fees. To resolve that,

On or before **June 24, 2013**, the debtors are to file a fee application in the standard format used for attorney fee applications in this District;

If Bankers Healthcare wishes to conduct any depositions related solely to this application, it may do so on or before **July 8, 2013.** Any such deposition is limited to 90 minutes;

On or before **July 15, 2013,** Bankers Healthcare is to file its statement in opposition, if any, limited to five pages; and

On or before **July 22, 2013**, the debtors may file a reply brief, if any, limited to five

19

pages.

No other briefs or documents are to be filed on this issue.  The court will take the matter

under submission after the filing of the last brief.

IT IS SO ORDERED.

_____
Pat E. Morgenstern-Clarren
Chief Bankruptcy Judge